UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ATLANTIC OCEANIC LLC | CIVIL ACTION |
| VERSUS | No. 25-974 |
| HF OFFSHORE SERVICES MEXICO SAPI DE CV, ET AL. | SECTION I (3) |

## ORDER AND REASONS

Before the Court is defendant HF Hunter Shipping Pte. Ltd.'s ("HF Hunter") motion[1] to vacate the maritime attachment of the *M/V HF Hunter*. Plaintiff Atlantic Oceanic LLC ("Atlantic Oceanic") filed a response in opposition.[2] HF Hunter filed a reply,[3] to which Atlantic Oceanic filed a sur-reply.[4] Both sides submitted supplemental briefing. The parties presented extensive live testimony and documentary evidence at a hearing on the motion. For the reasons below, the Court grants the motion in part and vacates the attachment. The motion is denied without prejudice in all other respects.

I.  BACKGROUND

Atlantic Oceanic's complaint alleges the following facts. In March 2024, HF Offshore Services Mexico SAPI de CV ("HF Mexico") and Atlantic Oceanic entered into a time charter of one of Atlantic Oceanic's supply vessels (the *M/V Atlantic*

---

[1] R. Doc. No. 16. The District Court designated the undersigned to hear and determine the motion under 28 U.S.C. § 636(b)(1)(A).  R. Doc. 41.
[2] R. Doc. No. 34.
[3] R. Doc. No. 35.
[4] R. Doc. No. 42.

*Tonjer*).[5] HF Mexico breached the charter beginning in June 2024 and wrongfully terminated the charter in August 2024.[6] In September 2024, Atlantic Oceanic submitted its claims against HF Mexico in a London arbitration proceeding.[7] That proceeding remains pending, with more than $10 million awarded thus far.[8]

The London arbitration did not involve the *M/V HF Hunter* nor HF Hunter.[9] Atlantic Oceanic filed the above-captioned lawsuit against HF Mexico, HF Hunter, and HF Offshore Towing SAPI de CV ("HF Towing"), however, because they are all "alter-egos of each other."[10] Thus, Atlantic Oceanic maintains, the London arbitration award against HF Mexico supports the attachment of HF Hunter's vessel, the *M/V HF Hunter*.[11] The linchpin of this claim is an allegation that "HF Mexico formed HF Hunter for the purpose of transferring ownership of the *M/V HF Hunter* to [HF Towing and then] HF Hunter . . . to shield the Vessel from any liability arising from HF Mexico's breach of the Charter."[12] As discussed below, Atlantic Oceanic did not establish probable cause to support this theory.

---

[5] R. Doc. No. 1, ¶ 18.
[6] *Id.* ¶ 22.
[7] *Id.* ¶ 26.
[8] *Id.* ¶¶ 37–38.
[9] *See id.* ¶¶ 13, 25.
[10] *Id.* ¶ 68.
[11] *Id.* ¶ 14.
[12] *Id.* ¶¶ 14, 41, 56.

## II.   STANDARD OF LAW

### A.   Attachment

"Maritime attachment is a distinctive admiralty remedy that was a part of American jurisprudence at the time the Constitution was adopted." *Ultra Deep Picasso Pte. Ltd. v. Dynamic Indus. Saudi Arabia Ltd.*, 119 F.4th 437, 441 (5th Cir. 2024) (citation omitted). Supplemental Admiralty Rule B "augments traditional *in rem* claims by providing a process for effecting *in personam* jurisdiction over an absent defendant via a maritime attachment claim." *See id.* Rule B requires a plaintiff to show that: (1) the plaintiff has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law barring the attachment. *See id.*; *see also Space Shipping Ltd. v. ST Shipping & Transp. Pte Ltd.*, No. 17-cv-10570, 2017 WL 4737277, at *1 (E.D. La. Oct. 19, 2017) (Fallon, J.) (citing *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006)).

A defendant may move to vacate an attachment under Rule E. *See Ultra Deep Picasso*, 119 F.4th at 441 (citing Fed. R. Civ. P. Supp. R. E(4)(f)). At this stage, the plaintiff bears the burden of producing "sufficient evidence to show probable cause for the attachment." *Casillo Commodities Italia S.P.A. v. M/V LONG CHEER*, No. 16-cv-16612, 2017 WL 2804925, at *4 (E.D. La. June 28, 2017) (Feldman, J.). A "district court must grant the motion if the plaintiff-garnishor fails to show that it

3

has satisfied the requirements of Rules B and E." *See Ultra Deep Picasso,* 119 F.4th at 441.

> B. **Alter Ego Liability**

The Court assumes, without deciding, that the London arbitration awards against HF Mexico are valid. Thus, the focus of the evidentiary hearing was whether those claims are valid as against HF Hunter. Atlantic Oceanic had the burden of establishing probable cause that HF Hunter's liability as an alter ego of HF Mexico supports the attachment of the *M/V HF Hunter*.

"[C]ourts will apply the alter ego doctrine and hold a parent liable for the actions of its instrumentality in the name of equity when the corporate form is used as a sham to perpetrate a fraud." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006). The alter ego doctrine, like all variations of corporate veil-piercing, "is reserved for exceptional cases." *Id.* The doctrine applies when "a parent company totally dominates and controls its subsidiary, operating the subsidiary as its business conduit or agent." *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691 (5th Cir. 1985).

The Fifth Circuit has adopted a totality-of-the-circumstances test for assessing alter ego liability. *See Oxford Cap. Corp. v. United States*, 211 F.3d 280, 284 n.2 (5th Cir. 2000). Courts may consider the following non-exhaustive list of factors:

> (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the

> parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

*Id.* These factors first arose in the context of a parent-subsidiary relationship, but they apply by analogy to sibling corporations. *See Simon v. Bertucci Contracting Co.*, No. CV 20-3320, 2022 WL 4079868, at *3 (E.D. La. Sept. 6, 2022) (Barbier, J.) (citing *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338–39 (5th Cir. 1999) (applying the alter ego factors to a corporate-sibling relationship "by analogy")). Atlantic Oceanic did not demonstrate probable cause that a parent-subsidiary or sibling relationship exists in this case. These factors remain relevant, however, to whether HF Hunter acted as a conduit of HF Mexico or could otherwise be liable as its alter ego.

"In making an alter ego determination, a court is concerned with reality and not form, and with how the corporation operated." *Bridas*, 447 F.3d at 416 (cleaned up) (internal quotation marks omitted). In other words, "alter ego examines the actual conduct of the parent vis-á-vis its subsidiary." *Id.* An alter ego relationship requires "not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." *Jon-T Chems.*, 768 F.2d at 691 (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973)).

5

## III. ANALYSIS

### A. The evidence demonstrates that HF Mexico likely has never owned the *M/V HF Hunter*.

Atlantic Oceanic's complaint rests on the allegation that HF Mexico initially owned the *M/V HF Hunter*, then transferred it to HF Hunter (through HF Towing) to shield the *M/V HF Hunter* from the London arbitration awards against HF Mexico. The evidence indicates this allegation is likely inaccurate.

HF Hunter has five shareholders with the following ownership percentages: PKR Shipping Gemicilik Limited Sirketi ("PKR") (20%), Beluga International DMCC ("Beluga") (36.7%), HF Towing (36.7%), Truls Trøan (3.3%), and Karl Staubo (3.3%).[13] Representatives of PKR, Beluga, and HF Towing testified credibly about the acquisition and ownership of the *M/V HF Hunter*. The seller was Seabulk Atlantic, LLC. The original buyer listed was HF Towing. Once HF Hunter was formed (and before the transaction closed), HF Hunter was substituted in as the named buyer.

Each testifying shareholder demonstrated familiarity with the purchase, including the price, estimated and actual repair costs, and timeline for putting the *M/V HF Hunter* in use. Their testimony relative to various independent economic motivations was credible and logical. The shareholders contributed funds consistent with their ownership interests. There was no evidence that any funds came from HF Mexico or that HF Mexico otherwise played a role in the transaction. Shareholders

---

[13] *See* HF Hunter Ex. 4, at 4–5. These percentages are for "preference" shares. *See id.* There is also a single common share whose owner is listed as HF Offshore GMBH. *See id.* at 5.

with a collective majority interest in HF Hunter were unaware of the London arbitration until relatively recently. Thus, the evidence suggests that a promising commercial opportunity, rather than any improper attempt to evade the London arbitration's reach, motivated HF Hunter's shareholders to buy the *M/V HF Hunter*.

The evidence also reflects that initially listing HF Towing as the buyer and then later substituting in HF Hunter was not an attempt to shield assets. Testimony confirmed that it is common practice to use a special purpose vehicle for vessel ownership. The decision to list HF Towing as the buyer at initial stages reflected the shareholders' joint desire to move quickly on a business opportunity. By proceeding with the transaction even before HF Hunter could be formed, the shareholders minimized delay and resulting commercial disadvantages. The ultimate substitution of HF Hunter as the named buyer was part of a planned and routine ownership structure. Thus, although Atlantic Oceanic's burden is not onerous at this stage, Atlantic Oceanic did not establish probable cause to support its alleged creation story for HF Hunter.

> **B.  The evidence demonstrates that HF Hunter likely is not an alter ego of HF Mexico.**

The parties introduced extensive evidence of the relationship (or lack thereof) between HF Mexico and HF Hunter. Atlantic Oceanic set forth some limited evidence connecting the two entities. Specifically, Heiko Felderhoff is a common officer or director as among HF Mexico, HF Towing, and HF Hunter. Felderhoff's common involvement across these entities, however, is insufficient to support alter ego liability when weighed with the other relevant factors. *See United States v. Jon-T*

7

*Chems., Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) ("Nevertheless, our cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil."); *see also United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.").

Atlantic Oceanic also introduced evidence that there was one shareholder decision that produced no meeting minutes with respect to the *M/V HF Hunter*.[14] More important, however, the same testimony confirmed that such decisions are the product of multiple shareholders' input. Thus, in practice, multiple independent shareholders have substantive decision-making authority.[15] HF Mexico did not directly nor indirectly control substantive decisions relative to the *M/V HF Hunter*.

The remaining evidence produced at this stage weighs against alter-ego liability. HF Hunter and HF Mexico have no common ownership. HF Mexico did not cause the incorporation of HF Hunter nor fund it. There is no evidence of consolidated financial statements. HF Hunter was adequately capitalized through its

---

[14] There has been limited need for business deliberations as to the use of the *M/V HF Hunter* since its arrest.

[15] The evidence demonstrates that, while HF Offshore GMBH has a single share and may have some say in day-to-day decisions, the five shareholders listed above are responsible for substantive or significant decisions. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) ("Unlike the theory of agency, which interprets a contractual relationship, alter ego examines the actual conduct of the parent vis-á-vis its subsidiary.") (internal citation omitted).

shareholders' contributions. HF Hunter paid its manager, HF Towing, an amount consistent with industry standards. Finally, although certain co-assureds are listed on HF Hunter's policy documents, HF Mexico is not among them. The evidence that HF Hunter acted independently and in its own best interest undermines the claim of alter ego liability.

### C. The evidence demonstrates that no injustice will result from vacating the attachment.

The parties dispute whether establishing alter ego liability requires fraudulent or wrongful conduct in addition to consideration of the facts set forth above. Given that Atlantic Oceanic did not pass the threshold requirement of showing alter-ego liability is appropriate on these facts, the Court need not reach the question. That said, there is no indication of fraud or wrongful conduct by HF Hunter as against Atlantic Oceanic, and no "manifest injustice to third parties" will result from vacating the arrest of the *M/V HF Hunter*. *See Talen's Landing, Inc. v. M/V Venture, II,* 656 F.2d 1157, 1160 (5th Cir. 1981).

The evidence presented at this stage indicates that HF Hunter and the *M/V HF Hunter* had nothing to do with the claims underlying the arbitration. Other than HF Towing (which has a shared officer with HF Mexico), none of the testifying shareholders was even aware of the dispute underlying the arbitration until relatively recently. The shareholder representatives who testified presented as credible, sophisticated, and experienced individuals who were familiar with the permissible business considerations behind HF Hunter's decisions. And there is no evidence that HF Mexico ever owned the *M/V HF Hunter*—whether by title or

9

*de facto* control—or otherwise used it to perpetuate any wrongful conduct as to Atlantic Oceanic. Although Atlantic Oceanic's representative testified as to his subjective belief that HF Hunter is a creature of HF Mexico, the evidence did not support that suspicion. "So long as the law allows associated groups to maintain an independent unity," a claimant's mere suspicion that an entire "enterprise was single in all its aspects" is not enough to support the attachment of property that would otherwise be unavailable. *See Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929) (Hand, J.).

## IV.   CONCLUSION

For the foregoing reasons, Atlantic Oceanic has not established probable cause to support the attachment of the *M/V HF Hunter*. Accordingly,

**IT IS ORDERED** that the motion to vacate the maritime attachment is **GRANTED IN PART** and that the attachment and garnishment of the *M/V HF Hunter* (IMO #9269506), its engines, tackle, and appurtenances (R. Doc. 8) are **VACATED**.

**IT IS FURTHER ORDERED** that the motion is **DENIED WITHOUT PREJUDICE** in all other respects. HF Hunter's requests for additional relief may be urged via separate motion.

**IT IS FURTHER ORDERED** that, consistent with the parties' agreement, any request for review of or objection to this decision be filed no later than **June 27, 2025**, unless otherwise ordered by the District Court.

New Orleans, Louisiana, June 20, 2025.

                                        **EVA J. DOSSIER**
                         **UNITED STATES MAGISTRATE JUDGE**