**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**ATLANTIC OCEANIC LLC** **CIVIL ACTION**

**VERSUS** **NO: 25-974**

**HF OFFSHORE SERVICES MEXICO SAPI DE CV, ET AL.** **SECTION: "H"**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter is before the Court on a limited remand from the Fifth Circuit Court of Appeals. On July 1, 2025, Defendant HF Hunter Shipping Pte. Ltd. filed an Emergency Motion for Release of Vessel, Enforcement of Order Vacating Attachment, Contempt, and Sanctions[1] and Plaintiff Atlantic Oceanic LLC filed a Motion to Stay Release of Vessel Pending Appeal.[2] On July 3, 2025, after the hearing oral argument on the motions, the Court issued an Order and Reasons ordering the release of the Vessel at issue.[3] Plaintiff sought a temporary administrative stay of these proceedings, which the Fifth Circuit granted on July 5, 2025.[4]

On July 8, 2025, the Fifth Circuit deferred Plaintiff's Motion for Stay Pending Appeal and remanded the case back to this Court to:

> explicitly address vessel attachment in light of (a) HF Mexico's ongoing listing as "operator" and guarantor of the vessel's potential pollution liability on the U.S. Coast Guard's National Pollution Funds Center's Certificate of Financial Responsibility

[1] Doc. 78.
[2] Doc. 79.
[3] Doc. 92.
[4] Doc. 93.

> (COFR) database; and (b) HF Mexico's ongoing listing as "owner/operator" of the vessel in the NRC Covered Vessels Washington State Contingency Plan (NRC Plan) database; alongside (c) all evidence and testimony previously considered, including but not limited to the differing ownerships of HF Hunter and HF Mexico.[5]

The Fifth Circuit's order also instructed that, "[i]f the court concludes that attachment is still unwarranted, then the court should also consider requiring a bond from Atlantic Oceanic to maintain attachment during further proceedings and appeal."[6] The Court ordered briefings addressing these issues.[7] On July 29, 2025, the Court held an evidentiary hearing and argument (the "July 29 Hearing").[8]

Having considered the record, the arguments of counsel, and the briefing, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

## **FINDINGS OF FACT**

1. On February 25, 2024, HF Offshore Services Mexico ("HF Mexico") and Plaintiff entered into a charter involving the *M/V Atlantic Tonjer*.
2. On June 26, 2024, Seabulk Atlantic, LLC ("Seabulk") and HF Towing Offshore Towing S.A.P.I. de C.V. ("HF Towing") entered into an agreement for HF Towing to buy a vessel named *M/V Seabulk South Atlantic* which was later renamed the *M/V HF Hunter* (the "Vessel").

---

[5] Doc. 94.

[6] *Id.*

[7] Defendant filed a Note of Documents on July 28, 2025 that featured a timeline of events, an updated alter ego factors chart, what it describes as key provisions from the HF Hunter Constitution, and the HF Hunter organizational chart. Doc. 103. During oral argument, Plaintiff provided the Court with its redlines by way of objections to Defendant's Note. Doc. 104.

[8] Doc. 104.

3. On July 17, 2024, HF Hunter Shipping PTE ("HF Hunter") was formed as a special purpose Singaporean company to buy and operate the Vessel. Investors included a consortium of international entities and individuals involved in the maritime and shipping industry. The shareholders with ownership percentages are: PKR Shipping Gemicilik Limited Sirketi ("PKR") (20%), Beluga International DMCC ("Beluga") (36.7%), HF Towing (36.7%), Truls Troan (3.3%) and Karl Stubo (3.3%).
4. Heiko Felderhoff is an owner and director of HF Offshore Group. HF Offshore Group includes, HF Mexico and HF Offshore Towings ("HF Towing"). The business is located in Mexico.
5. On August 13, 2024, HF Towing's agreement with Seabulk was amended to replace HF Hunter with HF Towing as the Vessel's buyer.
6. On August 21, 2024, Plaintiff initiated an arbitration in London against HF Mexico for the alleged breach of the February 2024 charter involving the *M/V Atlantic Tonjer*.
7. Neither HF Hunter nor the Vessel were mentioned in the arbitration claim.
8. On November 26, 2024, the Partial Final Arbitration Award was issued for the approximate amount of $500,000 and neither HF Hunter nor the Vessel were mentioned in the award.
9. On February 10, 2025, the Second Partial Arbitration Award was issued for the approximate amount of $9.5 million, and neither HF Hunter nor the Vessel were mentioned in the award.
10. On May 15, 2025, in an effort to secure their arbitration award, Plaintiff filed the instant action alleging that the HF Hunter was the alter ego of HF Mexico. Plaintiff's Motion for Issuance of Writ of Attachment for the Vessel was granted. Docs.1, 3, 7.

11. On May 20, 2025, the Vessel was seized at Port Fourchon. Doc. 13 at 1.
12. On July 1, 2025, Defendant HF Hunter filed an Emergency Motion for Release of Vessel, Enforcement of Order Vacating Attachment, Contempt, and Sanctions and Plaintiff filed a Motion to Stay Release of Vessel Pending Appeal. Docs. 78, 90.
13. On August 28, 2024, HF Hunter took delivery of the Vessel and transported it to GSRJ Shipyard, Kingston, Jamica for repairs. The Vessel remained in the shipyard until March 2025 when repairs were completed.
14. Both Heiko Felderhoff and Mustafa Pepe[9] are shareholders and executive committee members of GSRJ Shipyard.
15. While the Vessel underwent repairs from August 24, 2024 until March 2025, HF Mexico acted as the Vessel's manager.
16. On September 18, 2024, the Vessel was registered in Antigua and Barbuda, identifying HF Hunter as the owner.
17. Vessel managers are responsible for making sure that the vessel they manage can operate, which entails, *inter alia*, crewing and insuring the vessel. A vessel manager acts on behalf of the vessel's owner.
18. The Vessel Management clause of the HF Hunter's Constitution provides: "[HF Hunter] shall appoint a Vessel Manager in a Vessel Management Agreement and, as long as a Vessel Management Agreement is in force, solely the Vessel Manager shall be responsible for managing the Vessel in accordance with the terms thereof."
19. The United States Coast Guard requires vessels to obtain a Certificate of Financial Responsibility before they may operate in the waters of the United States to "ensure that the responsible parties for vessels . . . have

[9] Mustafa Pepe is an owner and director of PKR, and a shareholder in HF Hunter.

sufficient available financial resources to cover their potential liabilities to the United States and other claimants . . . in the event of a discharge, or substantial threat of a discharge, of oil; and . . . a release, or threatened release, of a hazardous substance." 33 C.F.R. § 138.10.

20. Procuring the COFR does not equate to ownership or control of a vessel.

21. HF Mexico served as the Vessel's manager from August 2024 through the completion of its repairs in March 2025. In that capacity, it oversaw the Vessel's regulatory compliance, which included obtaining a COFR.

22. HF Mexico used an intermediary, Hudson Marine Management Services ("Hudson Marine") to procure the COFR.

23. On March 12, 2025, the Vessel's repairs were complete, and it was able to leave GSRJ shipyard.

24. On March 12, 2025, management of the vessel was transferred from HF Mexico to HF Towing. As such, HF Towing was updated as the manager of the Vessel in Antigua and Barbuda and in multiple other maritime databases.

25. HF Hunter pays a daily fee for management services to HF Towing.

26. On March 12, 2025, the U.S. Coast Guard issued a COFR for the Vessel.

27. Maritime Insurance Solutions Ltd. provided the insurance coverage guaranty for obtaining the COFR. The Vessel had adequate insurance coverage by Gard to enter U.S. waters. Docs. 100-13, 100-14.

28. After it became the Vessel's manager in March 2025, HF Towing failed to promptly notify Hudson Marine of its role as vessel manager, and the COFR was not updated as a result.

29. HF Towing's oversight caused the listing of HF Mexico as the "owner/operator" for the Vessel in the COFR database past the time it was acting the manager of the Vessel.

30. "National Response Corporation ("NRC") is a company that provides maritime incident and disaster response services (*i.e.*, an oil spill removal organization or "OSRO"). NRC is qualified to respond to vessel oil spills in U.S. waters. [U]nder OPA 90, a vessel must have a contract with an OSRO to operate in U.S. waters." Doc. 100 at 6.
31. HF Mexico, as the Vessel's manager, contracted with Hudson Marine to register the Vessel with NRC.
32. Along with the contract with NRC for OSRO services, HF Mexico's predecessor, Harren & Partners, signed an addendum for NRC to provide coverage in Washington State waters. Doc. 100 at 6.
33. In March 2025, HF Mexico added the Vessel to the NRC contract its predecessor (Harren & Partners) had established in August 2023.
34. The Washington State NRC addendum caused the Vessel to be registered in the oil spill response plan.
35. After it became the Vessel's manager in March 2025, HF Towing failed to promptly notify Hudson Marine of its role as vessel manager, and the NRC was not updated.
36. HF Towing's oversight caused the listing of HF Mexico as the "owner/operator" for the Vessel in the NRC database past the time it was acting manager of the Vessel.
37. The COFR, the NRC database and the Washington State NRC addendum do not state that HF Mexico controls or owns the Vessel.
38. HF Hunter's shareholders testified credibly at the June 18 hearing held by Judge Dossier that they voted to accept the contract regarding the purchase of the Vessel and incur the costs associated with its repairs.
39. As the owner of the Vessel, HF Hunter paid for the premium for the Vessel's insurance coverage with Gard.

40. Gard covers the Vessel's pollution exposure.
41. Relying on undisputed testimony from HF Hunter shareholders regarding the purchase of the Vessel and the costs associate with repairs, HF Hunter was adequately capitalized through its shareholders' contributions.
42. There is no evidence that there are consolidated financial statements including tax returns between HF Mexico and HF Hunter.
43. There is no evidence that that HF Mexico exists solely as a holding company of subsidiaries.
44. There is no evidence that informal intracorporate loan transactions took place between HF Mexico and HF Hunter.
45. There is no evidence that contracts exist between HF Mexico and HF Hunter that are more favorable to HF Mexico.
46. Regarding the corporate formalities, or lack thereof, at issue here, the Court adopts Judge Dossier's findings "that it is common practice to use a special purpose vehicle for vessel ownership" and that "[t]he ultimate substitution of HF Hunter as the named buyer was part of a planned and routine ownership structure." Doc. 57 at 7. Further, the provisions from HF Hunter's Constitution submitted by Defendant as a part of its briefings suggests that HF Hunter does in fact abide by corporate formalities. Doc. 103-3.
47. HF Hunter was not a vehicle established by HF Services Mexico to avoid paying the London arbitration awards.
48. HF Mexico did not directly nor indirectly control substantive decisions relative to the Vessel.
49. Finding Mr. Felderhoff's testimony at the June 18 and July 29 Hearings credible, the Court concludes that a delay in updating the relevant

databases was the reasonable result of HF Mexico's working through the intermediary Hudson Marine.

50. HF Mexico's listing as "owner/operator" on the COFR and NRC databases when they were acting as manager of the Vessel does not support Plaintiff's alter ego liability theory.
51. Mr. Felderhoff did not direct the control of the Vessel to its manager HF Mexico.
52. HF Hunter is owned, funded and controlled by a group of independent shareholders with whom HF Mexico has no corporate connection and, as a result, cannot be an alter ego of HF Mexico.
53. By their own admissions, bond would not be practicable for either party.

## **CONCLUSIONS OF LAW**

54. "Pursuant to Supplemental Rule E(4)(f), a person claiming an interest in property arrested or attached is entitled to a hearing 'at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.' To carry its burden, the arresting or attaching party must present sufficient evidence to show that there were 'reasonable grounds' for attachment and that the arrest is supported by 'probable cause.' The plaintiff has the burden of proof to show why the arrest or attachment should not be vacated." *Casillo Commodities Italia S.P.A. v. M/V LONG CHEER*, No. CV 16-16612, 2017 WL 2804925, at *2 (E.D. La. June 28, 2017) (Feldman, J.) (internal citations omitted). "[P]ost-attachment hearings are 'not intended to definitively resolve the dispute between the parties; instead, the district court makes a preliminary

determination of whether reasonable grounds exist for the arrest.'" *Id.* at *4.

55. "[C]ourts will apply the alter ego doctrine and hold a parent liable for the actions of its instrumentality in the name of equity when the corporate form is used as a sham to perpetrate a fraud." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006). "The Fifth Circuit has adopted a totality-of-the-circumstances test for assessing alter ego liability," which parties have alluded to throughout the record. Doc. 57 at 4. (citing *Oxford Cap. Corp. v. United States*, 211 F.3d 280, 284 n.2 (5th Cir. 2000)). Courts may consider, inter alia, the following factors: (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary;(7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities. *Oxford Cap. Corp.*, 211 F.3d at 284 n.2.

56. "To justify the extraordinary step of holding the dominant party liable," in the Fifth Circuit, a Court "must find that this control amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant

corporation." *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 181 (5th Cir. 1981) (citing *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973), modified per curiam, 490 F.2d 916 (5th Cir. 1974)).

57. While a parent and subsidiary having common directors or officers may support a claim of alter ego liability, "overlap of ownership, officers, and directors is particularly common in the maritime industry." *Swaidan Trading Co., LLC v. Dileton Mar. S.A.*, No. CV 18-994, 2018 WL 1791155, at *10 (E.D. La. Apr. 16, 2018). "Felderhoff's common involvement across these [HF Mexico, HF Towing, and HF Hunter] . . . is insufficient to support alter ego liability when weighed with the other relevant factors." Doc. 57 at 7 (citing *United States v. Jon-TChems., Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) ("Nevertheless, our cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil.")).

58. The Court finds that Plaintiff's assertions—particularly those regarding the factors of consolidated financial statements, financing of the alleged subsidiary, and the alleged subsidiary's operation with grossly inadequate capital—are mere suspicions. Considering the entirety of the record, the Court does not find that there is probable cause to believe that HF Mexico has total domination of HF Hunter or the Vessel, nor that HF Mexico ever owned or now owns the Vessel. As such, the Court finds that Plaintiff has not borne its burden of providing reasonable grounds upon which the Court should maintain the arrest of the Vessel.

59. Moreover, the Court does not find Plaintiff's allegations of fraud sufficiently plead or argued. At this stage, still, the Court finds that

"there is no indication of fraud or wrongful conduct by HF Hunter as against Atlantic Oceanic, and no 'manifest injustice to third parties' will result from vacating the arrest of the *M/V HF Hunter*." Doc. 57 at 9 (quoting *Talen's Landing, Inc. v. M/V Venture*, II, 656 F.2d 1157, 1160 (5th Cir. 1981)) Accordingly, the Court concludes that the Vessel should not remain attached.

For the foregoing reasons;

**IT IS ORDERED** that the United States Marshal is relieved of any and all duties previously imposed by Order of the Court with respect to the *M/V HF Hunter*, and is **ORDERED** to release the vessel to the custody, care and control of her owner, HF Hunter Shipping Pte. Ltd. on Monday, August 11, 2025 at 12:00 p.m., and is **ORDERED** to take any further actions necessary to do so, to include taking into custody anyone preventing enforcement of this Order.

**IT IS FURTHER ORDERED** that National Maritime Services, Inc. is relieved of its duties as substitute custodian of the *M/V HF Hunter*, and is **ORDERED** release the vessel to the custody, care and control of her owner, HF Hunter Shipping Pte. Ltd. on Monday, August 11, 2025 at 12:00 p.m., and is **ORDERED** to take any further actions necessary to do so.

**IT IS FURTHER ORDERED** that Plaintiff, Atlantic Oceanic, LLC is **ORDERED** to immediately release the vessel to the custody, care and control of her owner, HF Hunter Shipping Pte. Ltd., and is **ORDERED** to take any further actions necessary to do so.

New Orleans, Louisiana this 8th day of August, 2025.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**